493 So.2d 539 (1986)
Edward J. BLOCH, M.D., Appellant,
v.
Kersten Watson ADDIS, Appellee.
No. 85-1172.
District Court of Appeal of Florida, Third District.
September 9, 1986.
Lanza, Sevier & O'Connor, Coral Gables, Daniels & Hicks and Ralph O. Anderson, Miami, for appellant.
Horton, Perse & Ginsberg and Edward A. Perse, Herbert W. Virgin, Miami, for appellee.
Before SCHWARTZ, C.J., and DANIEL S. PEARSON and JORGENSON, JJ.
DANIEL S. PEARSON, Judge.
In this medical malpractice action, we find fundamental error because the clearly improper final argument of the attorney for the plaintiff did so insidiously divert the jury from its duty to decide the question properly before it  that is, whether the defendant doctor was guilty of negligence which caused nerve damage to the plaintiff's wrist  that it is far more likely that the jury decided that, negligence or injury aside, the defendant should be fiscally punished for the supposed testimonial transgressions of a defense expert witness whose alleged deceit, according to the attorney's unsubstantiated argument, was born at some imagined conspiratorial country club meeting between the defendant and his medical experts and was personally known to the non-testifying plaintiff's attorney. We reverse and remand for a new trial.
The expert witness in question was Dr. Michael Goodson, a neurologist who had examined the plaintiff a week before the trial began and had concluded that she suffered from a carpal tunnel syndrome. In Dr. Goodson's opinion, the problem with the plaintiff's wrist and hand derived from her occupation and was not caused by the shoulder surgery performed by the defendant. According to Goodson, the problem was relatively minor.
It was apparently the theory of plaintiff's counsel, Mr. Fred M. Kray, that Goodson had tailored his testimony to conform to an electromyographic (EMG) study conducted by another neurologist, the results of which were not made known to Goodson until after he had examined the plaintiff. In furtherance of this theory, Kray accused Goodson of failing to mention carpal tunnel syndrome in a telephone conversation with Kray shortly after Goodson had examined the plaintiff. Kray also accused Goodson of having made, on the day of trial, handwritten notes reflecting the carpal tunnel syndrome diagnosis and passing off these notes as if made at or *540 about the time Goodson examined the plaintiff.
The witness explained:
"I'm trying to explain, if I may, the reason you don't have a report in this case, I saw this patient on March the fourth. My transcriber quit unexpectedly and left the office. I was unable to get any transcription service to take my work until this morning, so normally the report would have been typed up and available. The information I would have put in the report is exactly what I have testified to today."
The interrogation continued:
[BY MR. KRAY]
"Q. Is it the information I called you on the telephone about last Friday, did I not?
"A. I believe so, yes.
"Q. And at that time we discussed what you found in your court appointed, in your defense examination of this patient, didn't we?
"A. Yes, there was a discussion, yes.
"Q. And at no time during that discussion did you ever say one thing about carpal tunnel syndrome, did you?
"A. Yes, I did. I said she had median neuropathy at the wrist, which is carpal tunnel syndrome.
... .
"Q. When did you receive the EMG that talks about carpal tunnel syndrome?
"A. I think yesterday it came to my office.
"Q. And you would not have received that when you talked to me on Friday, would you?
"A. No.
"Q. And the first time that you ever had any idea about carpal tunnel syndrome is when you received that report, isn't that true?
"A. No, that's not true. You may see my notes at the  that I made at the time I saw my patient, which was prior to that. I would be happy to have you examine them.
"Q. And so if you knew that at that time, then you would have told me on the telephone, wouldn't you?
"A. Well, apparently 
"THE COURT: There's no way to establish what was said on the phone because you don't have a recording of it so let's don't get involved in what you might have said to him or he said to you in conference.
"BY MR. KRAY:
"Q. Let me see the notes.
"A. Certainly.
... .
"A. I've explained why my office was remiss in getting the report out but it was really due to circumstances we couldn't control.
"I'm very sorry but it would be more convenient, I'm sure, for everybody but actually as I stated my handwritten notes are there... ."
This, then, is the backdrop against which the plaintiff's final argument was given: there was no evidence in the case that Dr. Goodson failed to inform Kray on the telephone of his carpal tunnel syndrome diagnosis; there was no evidence in the case that Dr. Goodson wrote his examination notes at the time of trial; and the only evidence in the case  Dr. Goodson's testimony under oath  was that these insinuations were untrue. Despite this, Kray argued:
"And Doctor Goodson comes in here. He's hired by them. He writes a note out in the hall and then tell [sic] me he wrote it when he did the examination.
"If I got mad at him, I'm sorry, but I know what I said to him on the telephone. And I know and it's clear from the evidence that he never heard of the carpal tunnel syndrome until he got that EMG.
... .
"And I'm saying send [Dr. Bloch] a bill for [denying that his operation caused plaintiff's problems] and I'm saying in this case I want a message sent to the community that you will not allow Doctor Goodson to come and make a note out *541 in the hall and tell me that he did it when he was doing the surgery or when he was doing his examination, and throw it in my face and say you see this note, I did this when I examined her, and have Mrs. Falk say I saw him write it out in the hall.[1]
"All of these doctors came in, all these doctors who know each other and say we are going to the country club next week, can I do you a favor in that case?[2]
It is apodictic that, except in unusual circumstances, an attorney may not testify on behalf of his client. See Fla. Bar Code Prof. Resp., D.R. 5-102. Even if it could be said that Mr. Kray came within an exception to this prohibition, see Fla. Bar Code Prof. Resp., D.R. 5-101, he did not ask for permission to testify, did not take an oath, and did not subject himself to cross-examination. Instead, with a few carefully chosen words in his rebuttal argument  "I know what I said to him on the telephone. And I know and it's clear from the evidence that he never heard of the carpal tunnel syndrome until he got that EMG"  Kray placed before the jury his version of the conversation with Goodson and effectively impeached Goodson's testimony.
Building on the fact that he had now, singlehandedly, cast doubt on the credibility of the defendant's expert witness, Kray went on to suggest that the witness had lied to the jury about when he had written the notes he had brought to court and exhorted the jury to punish Dr. Bloch (and presumably the fraternity of doctors who belong to and socialize at country clubs and are willing to testify for each other as a favor) for Dr. Goodson's alleged dissembling.
It is well settled that error is "fundamental" and can be considered on appeal even though no objection has been made in the trial court where the error "goes to the foundation of the case or goes to the merits of the cause of action." Sanford v. Rubin, 237 So.2d 134, 137 (Fla. 1970); see Ray v. State, 403 So.2d 956 (Fla. 1981). But cf. Wagner v. Nottingham Associates, 464 So.2d 166, 170 (Fla.3d DCA), rev. denied, 475 So.2d 696 (Fla. 1985) ("fundamental error occurs when, no matter what was or could have been said by the other side at trial, the resulting judgment is fatally and incorrectly flawed"). In the present case, plaintiff's counsel, by design, took on the role of an impeaching witness. In testifying in the guise of arguing, Kray impugned the professional opinion and veracity of Dr. Goodson on the basis of Kray's alleged personal knowledge. And by asking the jury to make an example of Dr. Goodson through a verdict against Dr. Bloch, Kray succeeded, we think, in placing the conduct of Dr. Goodson and the imagined country club full of doctors, not the conduct of Dr. Bloch, on trial. The impropriety of this argument was particularly heightened here where the trial court, although stressing the importance of arguments of counsel, failed to inform the jury that arguments of counsel are not to be considered as evidence.
The promise made in Schreier v. Parker, 415 So.2d 794 (Fla.3d DCA 1982), that we would not condone arguments such as that made in the present case, even absent objection, fulfilled in Borden, Inc. v. Young, 479 So.2d 850 (Fla.3d DCA 1985), is fulfilled once again.
Reversed and remanded for a new trial.
NOTES
[1] Mrs. Falk did not testify that she saw Dr. Goodson write any note pertaining to this case out in the hallway during trial. She said she observed Dr. Goodson writing on a piece of blank paper and drawing a picture of an arm. She had not read what was written and didn't know if the writing had anything to do with this case.
[2] This reference to the country club was not Kray's first. At the outset of his final argument, he explained how difficult it was for doctors to testify against their colleagues: "They are all going to see the defendant at the country club." And later: "[N]o professional is ever going to like having discussed somebody he sees at the country club." The defendant's means and, a fortiori, his membership, if any, in a country club were simply not matters to be discussed before a jury not called upon to assess punitive damages.