752 So.2d 679 (2000)
Leo A. THOMAS, Appellant,
v.
STATE of Florida, Appellee.
No. 1D98-2698.
District Court of Appeal of Florida, First District.
February 9, 2000.
Rehearing Denied March 17, 2000.
*680 Leo A. Thomas of Levin, Middlebrooks, Thomas, Mitchell, Green, Echsner, Proctor and Papantonio, P.A., Pensacola, for Appellant.
Robert A. Butterworth, Attorney General, Carolyn J. Mosley, Assistant Attorney General, and L. Michael Billmeier, Assistant Attorney General, Tallahassee, for Appellee.
VAN NORTWICK, J.
Leo A. Thomas appeals an order holding him in direct criminal contempt for his comments during closing argument and, as a sanction, imposing a $100 fine. Because Thomas' closing argument, although admittedly unprofessional and unethical, did not either violate a clear order or instructions of the trial court or constitute an act that was facially contemptuous, we are constrained to reverse.

Factual and Procedural History
Thomas was retained by the family of A.F., a then 14 year old minor, to defend her against the charges of attempted first degree murder, aggravated assault with a firearm, and possession of a firearm by a person under the age of 18. The morning of jury selection, the trial court placed on each counsel's table a packet of information. The information included a memorandum from the trial court advising: "Attached you will find a checklist of what may not be argued in closing." In the memorandum, the trial court also reminded counsel of the requirements of Rule 4-3.4(e), Rules Regulating the Florida Bar, which was quoted in relevant part in the memorandum.[1] The packet also included a checklist of what was entitled "NO-NOs" and a copy of Judge Sorondo's concurring opinion in Fryer v. State, 693 So.2d 1046 (Fla. 3d DCA 1997). The cover memorandum closed with the advisory: "Please assure that any arguments made comply with these guidelines." The list of "NO-NOs" sets forth 19 prohibited practices during closing argument, including arguing facts outside the record, commenting on evidence ruled inadmissible, vouching for a witness, appealing to sympathy, and using "over emotionalism." No reference to these materials was included in the pretrial order and the trial court did not discuss the subject further with counsel before trial.
During the criminal trial, the defense argued that A.F. lacked the requisite intent necessary for a conviction because she was intoxicated by the drug Prozac. The record reflects that, during this difficult trial, the trial court and defense counsel disagreed as to the necessity of a Frye[2] hearing on the effect of Prozac, even though the prosecution had not requested such a hearing. During cross-examination of an expert for the state, Eric Kaplan, M.D., the following colloquy ensued between appellant and this expert:
Q. Now, the views that you have regarding adverse reactions to antidepressants such as Prozac, are these, generally speaking, the same views that the manufacturers have?

*681 A. It's the same views as the manufacturers have, and it's the same views as 99 plus percent of psychiatrists in the United States have.
Q. Okay. So your answer to that is yes?
A. My answer is my answer. My answer is yes and ...
Q. I asked you about your views alone, are they generally the same as the view of Eli Lilly, the company that you work for as a consultant? Yes or no?
A. Okay, well, let meYou just put three questions in there. First of all, I don't work for them, but I am a consultant for them. Second of all, the answer to the question then is yes, for some side effects, no for other side effects. I'm doing some research that shows that with some of these medications, you see side effects that is [sic] not in the package insert according to these pharmaceutical companies.
Q. Well, for example, there was, I think it was in the newspaper yesterday, did you see that article about adverse reactions killing a hundred thousand people a year. Did you read that, by any chance?
A. I did not read that, no.
Q. You did not see that.
A. No, I did not.
Q. You need to read that, Doctor.
A. Okay.
Q. It's in the News Journal yesterday.
MS. SPAIN [the Prosecutor]: Mr. Thomas, can I see that.
A. In that article is it antidepressants they discuss or something else?
Q. They don't discussthey just talk about adverse reactions to drugs.
A. Okay.
Q. I mean, you do agree that drugs do cause a lot of harm to people ...
A. No ...
Q. The side effects.
A. Well, hold on. You ask me a question.
Q. Right.
A. No, I do not agree that drugs do a lot of harm to patients. I think in the vast majority of circumstances, medications are very helpful and often save lives. I think in some circumstances people get side effects.
The trial proceeded, and during closing argument, Thomas stated:
Now what about Dr. Breggin [the expert on Prozac for the defense]? A critic of drugs? Heck, yes, he's a critic of drugs. Any reason to be? When a hundred thousand people in a year die from adverse drug reaction. I [don't blame him] ...[3]
The state's objection was sustained by the court, and the jury was instructed to disregard Thomas' comment. Shortly thereafter, Thomas further argued, as follows:
The first time according to the boys, what they said, the gun comes out is when Waylon, 6-foot one or 6 foot two, 220 pounds, starts coming at her. That's when the gun comes out. And this is some hundred pounds or 150 pounds more, who the evidence has shown and there's been no rebuttal has sexually assaulted this young girl.
MS. SPAIN: I'm going to object, your honor. There's been
THE COURT: Sustained.
MS. SPAIN:to that.
THE COURT: Sustained. It was indirect impeachment evidence.
MR. THOMAS: No. It was from the two experts and the Courtthis is exactly *682 what I asked you earlier, Judge, to allow me to introduce it.
THE COURT: And I denied it, and I've gone over and over again. It's not direct evidence.
MR. THOMAS: Well, could we approach the bench on this then?
THE COURT: No. I've already made my ruling. You will not discuss that.
Thomas concluded his closing as follows:... it's been a long time since my teens, but those were wonderful years. And the loss of one of those years is tragic, of course. And what would I ask you at this time, is to consider the facts and ask yourselves has the State proved beyond a reasonable doubt. If they haven't, you need to send [A.F.] back to her family so that she can get the tender loving care and the treatment she needs.
The state again objected, and the trial court responded:
The objection is sustained and the jury is instructed to clearly disregard that. It is clearly inappropriate for an attorney in closing arguments to make appeals to sympathy, prejudice, or a juror's self-interest. And any appeals to your sympathywhen I do the instructions tomorrow, there will be a clear instruction that you're not to decide this case based upon any bias, sympathy, prejudice or any of these. Your sole job is to listen to the evidence and listen to my instruction on the law tomorrow and pull those two together. And, as I said before the attorneys started speaking, that what they say is not evidence in the case nor your instructions on the law. So I ask youor instruct you to disregard any appeal to sympathy in this case. Go ahead.
The jury returned a verdict finding A.F. guilty of attempted second degree murder, a lesser offense of attempted first degree murder, aggravated assault with a firearm, and possession of a firearm by a minor. Thereafter, the trial court served Thomas with an order to show cause why he should not be held in direct criminal contempt. In the order, the trial court stated that the packet of information was delivered to counsel before trial which specifically listed "what may not be argued at closing" and which "required counsel to `assure that any arguments made comply with the (given) procedures.'" The trial court further recounted how appellant "inappropriately" commented on a newspaper article during his cross-examination of the state's expert and how shortly after this cross-examination, while attempting to bolster the credibility of his own witness appellant commented that his witness had reason to be a critic of drugssuch as Prozac because "100,000 people die from adverse drug reaction." The trial court noted that appellant commented, "I don't blame him." The trial court further stated in the order to show cause that the cross-examination of the state's expert and the comment during closing arguments about the contents of the newspaper article "violated this Court's order, applicable law and ethical constraints for numerous reasons." The trial court continued:
No witness ever acknowledged even reading the [newspaper] article much less relying on the statements therein. The article's contents were never admitted into evidence. Mr. Thomas made gratuitous comments about the article when the witness denied knowing or relying upon its content. Nonetheless, Mr. Thomas inappropriately used the contents of the article in his closing argument to enhance or vouch for the credibility of his own witness and/or state his own personal beliefs on the issue.
The trial court also mentioned in the order to show cause that appellant "inappropriately" appealed to the jurors' sympathy in his closing by stating that if the State had not met its burden of proof, then "you [i.e., the jury] need to send [A.F.] back to her family so she can get the *683 tender loving care and the treatment that she needs." (Bracketed material added).
The trial court then explained:
5. Taking these comments in light of the trial and issues raised therein, this Court reluctantly believes that the inappropriate comments regarding the contents of the newspaper article and appealing to the jurors' sympathy were neither accidental nor incidental and were in direct conflict with this Court's express written instructions. The comments appear both intentional and well calculated to address the heart of the Defendant's case. The comments were thus prejudicial.
6. Given the above, this Court cannot disregard the incident. It goes to the very core of the integrity of the judicial process. Mr. Thomas appears to have clearly crossed over the line from appropriate zealous advocacy to being contemptuous of this Court and its orders. As stated in the preamble to Chapter 4 of the Rules Regulating the Florida Bar:
A lawyer's responsibility as a representative of clients, an officer of the legal system and a public citizen are usually harmonious. Zealous advocacy is not inconsistent with justice.... Lawyers are officers of the court and they are responsible to the judiciary for the propriety of their professional activities.
It is to this duty as an officer of the Court and the concomitant responsibilities counsel has to the Court for the propriety of his professional activities that this order to Mr. Thomas issues and will be addressed at the hearing set forth below.
In his response to the order to show cause, Thomas first noted that the list of "NO-NOs" is not an "order" of the court, and thus may not be used as a basis for a finding of direct criminal contempt. Further, he took exception to the findings made in the order to show cause suggesting that the trial court had misread the record, and argued that statements at issue in his closing were fair comment, especially given the argument made by the state.
After unsuccessfully moving to dismiss the show cause order, unsuccessfully seeking a stay, twice moving unsuccessfully for a writ of prohibition from this court, and unsuccessfully seeking the disqualification of the trial court, Thomas appeared at the hearing set for the show cause order and essentially rested on his response. He was found to be in direct criminal contempt and was fined $100.
In the written order of direct criminal contempt, among other things, the trial court stated:
5. Mr. Thomas' closing argument was contemptuous for the following reasons:
a. As stated in paragraph one (1) of the Order to Show Cause, Mr. Thomas was provided pre-trial with specific instructions relative to closing arguments. (See Attachment 1 thereto.) He was told to "assure that any arguments made comply with the (given) guidelines." These instructions:
i. attached a checklist of what may not be argued in closing;
ii. referred him to the applicable Rule 4-3.4(e) of the Rules Regulating the Florida Bar;
iii. in paragraph thirteen (13) of the "Court DecorumGuidelines for Counsel," specifically stated "counsel shall not express personal knowledge or opinion concerning any matter at issue."
This checklist and the accompanying case law was obtained by this Court from a recent Florida Circuit Judges' Conference continuing education course on how to avoid improper closing argument. The checklist is recognized by judges throughout Florida as a succinct and accurate statement of what the law deems improper argument. It is an effective tool in the continuing effort of courts throughout Florida to avoid improper *684 argument by counsel. This Court adopted and applied this tool upon the advice and recommendation of the instructor selected by the Florida Circuit Judges' Conference. Just as prosecutorial conduct demands the strictest attention of the Florida Bar and the Court, justice demands that similar conduct by defense counsel which violates the Rules of Professional Conduct deserves the same attention.
b. Mr. Thomas is a highly experienced, capable and very seasoned criminal defense attorney who for many years has been routinely involved in the most high profile, contentious and difficult criminal cases in the First Circuit. He tried one such high profile and contentious case before this Court in 1997. That trial allowed this Court to personally observe Mr. Thomas' ability and methodology. Mr. Thomas prepares well and is a masterful trial tactician. He knows the law. He knows what is proper and improper comment in closing argument. He knows how to make and preserve a record. As a seasoned professional, he does not allow his emotions to overcome his mind during trial. This leads to the following:
i. The checklist contained nothing new to Mr. Thomas. Even without this list, he was and is fully aware of the legal and ethical boundaries of proper closing arguments. He simply "pushed the envelope" too far and breached these boundaries;
ii. The comments deemed contemptuous are clearly and unequivocally improper. Mr. Thomas knew they were improper when he made them. His vain attempt to argue otherwise in his response supports this conclusion. Mr. Thomas avoids referencing case law on point in his response and attempts to avoid the issue by attacking the prosecutor and her argument. He knows better;
iii. The contemptuous portion of his argument was not unintentional and the result of emotions run amuck. Such a disclaimer by Mr. Thomas does not deprive this Court of its power to declare his conduct to be contemptuous and to punish it accordingly. The arguments were neither accidental nor incidental. They were intentional and well calculated to address the heart of the defendant's case.
c. The contemptuous statements were clearly violative of this Court's pre-trial instruction to counsel, well-established case law, Rule 4-3.4(e) of the Rules Regulating the Florida Bar, and this Court's Guidelines for Courtroom Decorum.
6. This Court is fully aware that it should exercise its power to adjudge an attorney in contempt with care and circumspection. In over seven and one-half years on the bench, I recall holding only one other attorney in contempt of court. I have not taken this action without spending significant time deliberating upon it. This circumspection is evidenced by my making a brief statement at trial to simply preserve the record and thereafter waiting until the case in which the improper comment was made was no longer before me to consider this contempt. Though use of contempt powers must be prudent, judges must not allow unprofessional conduct before them. As numerous lawyers and judges have re-emphasized over the past years, the courts have a duty to adopt a more demanding posture toward violations of professional norms. Prior to the start of what this Court anticipated to be a contentious case, this Court reminded the attorneys of the higher values of this profession and commanded their allegiance thereto in an effort to re-enforce the civility and professionalism to which we all aspire. Despite this good faith effort, Mr. Thomas intentionally violated the norms set forth within the controlling Rules Regulating the Florida Bar and applicable case law. To simply sustain an objection from opposing counsel *685 and give a curative instruction when the intentional damage was already done does not address the source of the error. This Court reluctantly has no option but to conclude that Mr. Thomas' intentional and inappropriate comments were contemptuous and to sanction him therefore.
(Footnotes omitted).

Standard of Review
We undertake review of the order of direct criminal contempt mindful that the controlling standard of review is the abuse of discretion standard, Carnival Corp. v. Beverly, 744 So.2d 489 (Fla. 1st DCA 1999), and Pompey v. Cochran, 685 So.2d 1007 (Fla. 4th DCA 1997), and that since the trial court has witnessed the conduct at issue, the trial court therefore is in the best position to determine whether it is necessary to summarily punish counsel for contemptuous conduct. Carnival, 744 So.2d at 493; In Re Gustafson, 650 F.2d 1017, 1023 (9th Cir.1981).[4] Thus, appellate courts "give great deference to a trial judge's explicit determination that ... summary procedures are necessary." Id.

Guidelines as a Basis for a Contempt Order
Appellant does not argue that the trial court failed to satisfy the procedural requirements of rule 3.830, Florida Rules of Criminal Procedure. He complains that because he did not violate an order, per se, of the trial court, that he cannot be held in direct criminal contempt. Although appellant did concede in oral argument before this court that his comments during closing argument were improper and perhaps a finding of contempt would have been avoided had appellant taken a more contrite demeanor before the trial court, he nevertheless argues that his conduct does not rise to the level of contemptuous. We agree that appellant's conduct did not warrant a finding of direct criminal contempt. Although we do not agree that a finding of direct criminal contempt can only be made when there has been a violation of a specific written or verbal court order or direction made directly to the alleged contemnor, the placement of a list of guidelines on counsel's table, without more, is an insufficient basis for a finding of contempt.
Rule 3.830, Florida Rules of Criminal Procedure, does not define criminal contempt. Case law establishes that a party may be held in direct criminal content for the violation of an order of the court or for an act which is facially contemptuous. See Lawrence v. Lawrence, 384 So.2d 279 (Fla. 4th DCA 1980). Thus, the definition of criminal contempt is not restricted to a violation of an order per se. For example, the Second District, explained in Via v. State, 633 So.2d 1198 (Fla. 2d DCA 1994):
The test in determining whether conduct constitutes criminal contempt is whether the conduct interferes with or impugns the judicial function, not whether it causes a particular judge to feel aggrieved or vexed. Direct criminal contempt results from conduct committed in the presence of a judge; indirect criminal contempt concerns conduct that has occurred outside the presence of the judge that violates a court order.
(Citations omitted); see also Tarrant v. State, 537 So.2d 150, 152 (Fla. 2d DCA 1989)(finding it "elementary that conduct *686 of an attorney which is improper and unethical lessens the dignity of the court...").
Similarly, in Thompson v. State, 618 So.2d 781 (Fla. 5th DCA 1993), the court observed that criminal contempt could be based on an act calculated to embarrass, hinder or obstruct the trial court in the administration of justice or which is calculated to lessen the court's authority or dignity. There is no mention of a requirement that the contemnor have violated a court order per se. Cases from this court are similar. See Landingham v. Landingham, 685 So.2d 946 (Fla. 1st DCA 1996); Bontrager v. Sessions, 582 So.2d 766 (Fla. 1st DCA 1991); Tarrant v. State, supra.
Improper closing arguments have been a matter of great concern in Florida courts for some time. See, for example, Baptist Hosp., Inc. v. Rawson, 674 So.2d 777 (Fla. 1st DCA 1996); Sacred Heart Hosp. v. Stone, 650 So.2d 676 (Fla. 1st DCA 1995); Silva v. Nightingale, 619 So.2d 4 (Fla. 5th DCA 1993); Bloch v. Addis, 493 So.2d 539 (Fla. 3d DCA 1986); see generally, Gary D. Fox, Objectionable Closing Argument: Causes and Solutions, 70 Fla. B.J. 43 (Dec.1996); Hon. Larry A. Klein, Allowing Improper Argument of Counsel To Be Raised for the First Time on Appeal as Fundamental Error: Are Florida Courts Throwing Out the Baby With the Bath Water? 26 Fla. St. U.L.Rev. 97 (1998). Moreover, we fully concur with Judge Antoon that trial judges do have a "long-standing responsibility to protect jurors from improper closing arguments, even in the absence of a proper objection," D'Auria, et al. v. Allstate Ins. Co., 673 So.2d 147 (Fla. 5th DCA 1996)(Antoon, J., concurring), despite the near Sisyphean effort such protection seems to require. We also agree that using pretrial conferences and orders to remind counsel of the ethical obligations and impose limitations on closing argument may work to reduce improper closing arguments.[5]
Although the list of "NO-NOs" and other material were not styled as an order of the circuit court, the trial court did attach a cover memorandum which included the instruction that closing arguments must comply with the guidelines noted in and attached to the memorandum. The trial court, however, did not discuss the guidelines with counsel or state in the memorandum that violating the list of "NO-NOs" would result in the imposition of direct criminal contempt.
We are not setting forth a bright line rule as to how many reminders trial counsel must receive about the requirements of the Florida Bar Rules, which trial counsel has previously sworn to uphold. Further, although we agree with Judge Schwartz that "it is no longerif it ever was acceptable for the judiciary to act simply as a fight promoter, who supplies an arena in which parties may fight it out on unseemly terms of their own choosing ...," Borden, Inc. v. Young, 479 So.2d 850, 851 (Fla. 3d DCA 1985), we are not proposing to relegate the distinguished members of the trial bench to trial practice instructors. The responsibility for mastering the requirements of ethical closing arguments is clearly placed on the trial attorneys. As Judge Blue has admonished:
Trial attorneys must avoid improper argument if the system is to work properly. If attorneys do not recognize improper *687 argument, they should not be in a courtroom. If trial attorneys recognize improper argument and persist in its use, they should not be members of The Florida Bar.
Luce v. State, 642 So.2d 4 (Fla. 2d DCA 1994)(Blue, J., concurring specially).
Nevertheless, we find that, prior to finding that trial counsel has committed a crime by virtue of his closing argument, Florida law requires that there must be some direction or admonition beyond the mere placement on counsel's table of a memorandum with a list of prohibited practices. See Kranis v. Kranis, 313 So.2d 135, 139 (Fla. 3d DCA 1975)(courts should be explicit and precise in their commands and should only then be strict in exacting compliance); Herrera v. State, 710 So.2d 1392 (Fla. 3d DCA 1998). Accordingly, we are constrained to reverse the contempt order.
We find the other issue raised on appeal to be without merit and therefore affirm the order denying the suggestion of disqualification.
AFFIRMED in part and REVERSED in part.
WEBSTER AND BROWNING, JJ., CONCUR.
NOTES
[1] Rule 4-3.4(e) provides: "A lawyer shall not:... (e) in trial allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused."
[2] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923); Flanagan v. State, 625 So.2d 827 (Fla. 1993).
[3] The transcript contained in the record on appeal does not include the bracketed material, but appellant includes this bracketed material in his recitation of the facts, and the trial court also includes this material in the order under review. There is no argument before us that appellant did not say what is quoted in the bracketed material, and we therefore are considering it.
[4] As noted in Carnival, 744 So.2d at 493, rule 3.830, Florida Rules of Criminal Procedure, "is patterned after Federal Rule of Criminal Procedure 42(a)." Committee Notes, Rule 3.830, Fla. R.Crim. P., In re Amendments to Florida Rules of Criminal Procedure, 606 So.2d 227, 336 (Fla.1992). "Federal case law which construes a federal rule after which a Florida rule is patterned may be considered in interpreting the Florida rule...." Sheradsky v. Basadre, 452 So.2d 599, 602 (Fla. 3d DCA 1984) (citations omitted), rev. denied, 461 So.2d 113 (Fla.1985). Thus, when considering the summary contempt power of courts, Florida courts have frequently cited to federal authority. See, e.g., Shelley v. District Court of Appeal, 350 So.2d 471, 473 (Fla.1977).
[5] As one commentator has recommended:

Trial judges can help reduce the incidence of [problematic] closing arguments ... by including as a part of every order setting a case for trial an unambiguous statement that lawyers who try cases before them will be expected to know and follow the law of closing arguments. At case management or pretrial conferences, the trial judge should reiterate these expectations. Another reminder should be given at the charge conference, shortly before the argument is to take place. The court should encourage attorneys to seek pre-argument rulings on proposed statements or arguments which fall into the gray areas.
Gary D. Fox, Objectionable Closing Arguments: Causes and Solutions, 70 Fla. B.J. 43 (December 1996).